IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


NATURAL RESOURCES DEFENSE          )
COUNCIL, INC., et al.,             )
                                   )
v.                                 )          No. 3:08-0229
                                   )          JUDGE TODD J. CAMPBELL
COUNTY OF DICKSON, TENNESSEE,      )
et al.,                            )


## MEMORANDUM

### I. Introduction

Pending before the Court are the Corporate Defendants' Joint Motion For Summary Judgment Pursuant To Fed. R. Civ. P. 56(c) And Local Rule 56.01 (Docket No. 361); the County Of Dickson And City Of Dickson's Motion For Summary Judgment (Docket No. 365); and the Plaintiffs' Joint Motion For Partial Summary Judgment (Docket No. 371). For the reasons set forth herein, the Corporate Defendants' Joint Motion For Summary Judgment (Docket No. 361) is DENIED; the Governmental Defendants' Motion For Summary Judgment (Docket No. 365) is DENIED; and the Plaintiffs' Joint Motion For Partial Summary Judgment is GRANTED in part, and DENIED in part. Plaintiffs' request for summary judgment on the issue of jurisdiction is granted.

Also pending before the Court are the Corporate Defendants' Motion For Permission To File Supplemental Memorandum In Support Of Joint Motion For Summary Judgment (Docket No. 449); Plaintiffs' Motion For Oral Argument On Cross-Motions For Summary Judgment (Docket No. 442) and Plaintiffs' Joint Motion To Strike Declaration Of Paul Sloan (Docket No. 425). The Corporate Defendants' Motion For Permission To File Supplemental Memorandum

(Docket No. 449) is GRANTED.  Plaintiffs' Motion For Oral Argument (Docket No. 442) is

DENIED, as the Court finds oral argument unnecessary.  Plaintiffs' Motion To Strike (Docket

No. 425) is DENIED, as moot, as the Court finds it unnecessary to consider the testimony of Mr.

Sloan to resolve the pending motions. For purposes of resolving the pending motions, the

position of the State of Tennessee is adequately set forth in the testimony of Charles L. Head to

which no objection has been raised. The Court expresses no opinion on the admissibility of the

testimony of Mr. Sloan or Mr. Head at the trial of this case.

II.  <u>Factual and Procedural Background</u>

Plaintiffs Natural Resources Defense Council, Inc. ("NRDC"), Beatrice Holt, and Sheila

Holt-Orsted brought this action against Defendants County of Dickson, Tennessee, City of

Dickson, Tennessee, ALP Lighting and Ceiling Products, Inc., Nemak USA, Inc., and Interstate

Packaging Co., pursuant to the citizen suit provisions of the Resource Conservation and

Recovery Act, 42 U.S.C. § 6972(a)(1)(B) ("RCRA") to abate an alleged "imminent and

substantial endangerment to human health and the environment posed by trichloroethylene

('TCE') and perchloroethylene ('PCE') disposed at the Dickson Landfill, in Dickson,

Tennessee." (Amended Complaint, at ¶ 1 (Docket No. 198)).  The Amended Complaint

specifically alleges:

> 1.  . . . TCE and PCE were once commonly used as industrial solvents and
> degreasers.  For decades, industrial and other hazardous and solid wastes
> including TCE and PCE were dumped at the Landfill.  Those wastes did not stay
> put.

> 2.  The Landfill site is now extensively contaminated with TCE, PCE and
> these chemicals' degradation products.  TCE and PCE pollution have seeped deep
> beneath the Landfill to underlying groundwater.  TCE contamination has rendered
> water from wells and springs two to three miles from the Landfill unfit for human

2

consumption.  Polluted spring water is flowing directly into the West Piney River, a fishing stream and a major source of drinking water for the Water Authority of Dickson County.  Several square miles of Dickson County have been recognized as an "imminent threat" area by the County.  TCE contamination above drinking water limits, and orders of magnitude above United States Environmental Protection Agency ('EPA') drinking water screening levels, has been found in at least two wells even outside that threat area.  In some areas, this contamination appears to be worsening.

3.   Although sweet to the smell and colorless to sight, TCE and PCE are toxic.  Exposure to TCE has been linked to nervous system impairment; liver and lung damage; abnormal heartbeat; low birth weight, congenital heart defects, orofacial defects, and other developmental harms; and comas.  Exposure to PCE can cause nervous system impairment, liver damage, kidney damage, comas, and reproductive system harm.  TCE and PCE are also likely human carcinogens.  At sufficient exposure levels, TCE and PCE cause death.

4.   Defendants in this case, the Landfill's owners and operators and the owners of local industrial facilities that disposed of TCE and/or PCE at the Landfill, have not taken steps necessary to protect health and the environment from the contamination emanating from the site.  More than two decades after TCE was first detected in nearby drinking water sources, Defendants have not fully characterized the present and likely future extent of the TCE and PCE contamination.  Defendants have not contained the contamination's continued migration.  Defendants have, instead, effectively surrendered the soil and ground and surface water of Dickson County to the slow spread of these invisible and toxic chemicals.

5.   Section 7002(a)(1)(B) of the Resource Conservation and Recovery Act ('RCRA'), 42 U.S.C. § 6972(a)(1)(B), authorizes private persons to sue those responsible for such contamination to compel a comprehensive investigation and cleanup. Defendants City of Dickson, Tennessee and County of Dickson, Tennessee own and operate the Landfill, and are responsible for its management.  Defendants ALP Lighting and Ceiling Products, Inc. ('A.L.P.'), Nemak USA, Inc. ('Nemak') and Interstate Packaging Company ('Interstate') own industrial facilities in the Dickson area that generated TCE and/or PCE wastes, some of which were disposed at the Landfill. Each Defendant has contributed to the disposal and management of TCE- and/or PCE- contaminated waste that may present an imminent and substantial endangerment to human health and the environment of Dickson County.

6.   Plaintiff Beatrice Holt owns and resides on a property adjacent to the Landfill (the 'Holt property') that is contaminated with TCE and a chemical

degrade of TCE and PCE. Plaintiff Sheila Holt-Orsted, Beatrice Holt's daughter, resided at the Holt property for many years and continues to spend substantial time there. Plaintiff Natural Resources Defense Council, Inc. is a non-profit environmental organization with members throughout the United States, including in Dickson County. Through this suit, Plaintiffs seeks to compel Defendants to investigate and characterize fully the spread of TCE and PCE contamination from the Landfill, to restore the waters and lands of Dickson County that have been polluted by this contamination, and to protect the health of Dickson County's residents and environment.

(Docket No. 198, at ¶¶ 1-6).

Based on the discovery that has now been completed in this case, the parties appear to agree that in 1994, the State of Tennessee notified the County that the Landfill tested positive for contamination, and that the State issued orders with regard to the Landfill thereafter. The parties agree on little else. Yet all have filed motions for summary judgment.

The Governmental Defendants, the County of Dickson and the City of Dickson, contend that they are entitled to summary judgment because the Plaintiffs do not have sufficient evidence to support their allegations. More specifically, Defendants seek summary judgment on the following grounds: (1) the Landfill does not present an imminent and substantial endangerment to health or the environment; (2) the EPA and the State of Tennessee have already determined that no imminent and substantial endangerment exists; and (3) the primary jurisdiction doctrine and the Burford abstention doctrine require dismissal of Plaintiffs' claims.

The Corporate Defendants, ALP Lighting & Ceiling Products, Inc., Nemak USA, Inc., and Interstate Packaging Company, seek summary judgment on the following grounds: (1) ALP Lighting did not dispose of TCE or PCE containing wastes in the Landfill; (2) Interstate Packaging did not dispose of TCE or PCE containing wastes in the Landfill; (3) Nemak did not dispose of TCE containing waste in the Landfill and disposed of only a limited amount of

materials containing de minimis amounts of PCE in a limited number of the Landfill units; (4) the Corporate Defendants have not contributed to the contamination found in the area surrounding the Landfill that is the basis for Plaintiffs' claim that there is an imminent and substantial endangerment to health or the environment; and (5) NRDC does not have standing in this case as the one and only member it has put forward in support of the organization's standing cannot demonstrate injury in fact.

The Plaintiffs seek summary judgment on the following grounds: (1) the Court has jurisdiction under 42 U.S.C. § 6972(a) and Article III of the Constitution; (2) chlorinated solvents disposed at the Dickson Landfill "may present an imminent and substantial endangerment to health or the environment;" and (3) Defendants City of Dickson, County of Dickson, and Nemak, USA, Inc. contributed to the disposal of waste that "may present an imminent and substantial endangerment to health or the environment."

III.  <u>Analysis</u>

A.  <u>The Standards for Considering Summary Judgment</u>

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In deciding a motion for summary judgment, the Court must review all the evidence, facts and inferences in the light most favorable to the nonmoving party. <u>Hamilton v. General Electric Co</u>., 556 F.3d 428, 433 (6th Cir. 2009); <u>Van Gorder v. Grand Trunk Western Railroad, Inc.</u>, 509 F.3d 265, 268 (6th Cir. 2007).

In order to defeat a summary judgment motion, the nonmoving party must provide more than a scintilla of evidence; that is, the nonmoving party must present evidence sufficient to permit a reasonable jury to find in its favor. Van Gorder, 509 F.3d at 268. Entry of summary judgment is appropriate against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's cases, and on which that party will bear the burden of proof at trial. Id.

B. Imminent and Substantial Endangerment to Health or Environment

Plaintiffs have brought this "citizen suit" action under Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B). That section provides that a citizen may bring a civil action regarding any solid or hazardous waste "which may present an imminent and substantial endangerment to health or the environment." The Governmental Defendants argue that summary judgment is warranted because the Landfill does not pose an imminent and substantial endangerment to health or the environment.

Both sides cite the Sixth Circuit's decision in Davis v. Sun Oil Co., 148 F.3d 606 (6th Cir. 1998) in describing what a plaintiff must show to establish that contamination "may present an imminent and substantial endangerment to health or the environment" as contemplated by RCRA. Quoting the Second Circuit's decision in Dague v. City of Burlington, 935 F.2d 1343, 1355-56 (2nd Cir. 1991), the Davis court stated:

RCRA is a remedial measure that courts have tended to construe and apply in a liberal, though not unbridled, manner. The Second Circuit has discussed the statute as follows:

When congress enacted RCRA in 1976, it sought to close 'the last remaining loophole in environmental law, that of unregulated land disposal of discarded materials and hazardous wastes.' RCRA's

waste management requirements for disposal facilities are designed not only to prevent, but also to mitigate endangerments to public health and the environment.

Significantly, congress used the word 'may' to preface the standard of liability: 'present an imminent and substantial endangerment to health or the environment'. This is 'expansive language', which is 'intended to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate any risk posed by toxic wastes.'

The statute is 'basically a prospective act designed to prevent improper disposal of hazardous wastes in the future'. It is not specifically limited to emergency-type situations. A finding of 'immanency' does not require a showing that actual harm will occur immediately so long as the risk of threatened harm is present: 'An "imminent hazard" may be declared at any point in a chain of events which may ultimately result in harm to the public.' Imminence refers 'to the nature of the threat rather than identification of the time when the endangerment initially arose.'

In addition, a finding that an activity may present an imminent and substantial endangerment does not require actual harm. Courts have consistently held that 'endangerment' means a threatened or potential harm and does not require proof of actual harm.

Davis, 148 F.3d at 609 -610 (footnote omitted).

The parties also cite subsequent decisions by other circuits interpreting the citizen suit standard. In Burlington N. & Santa Fe Fy. Co. v Grant, 505 F.3d 1013, 1020-21 (10th Cir. 2007), the Tenth Circuit explained that the phrase "may present" an imminent and substantial endangerment communicates the idea that "the endangerment must be ongoing, but the conduct that created the endangerment need not be." According to the court, "substantial" means "serious" – where "there is reasonable cause for concern that someone or something may be exposed to risk of harm by release, or threatened release, of hazardous substances in the event remedial action is not taken." 505 F.3d at 1021.

In <u>Parker v. Scrap Metal Processors, Inc.</u>, 386 F.3d 993, 1015 (11th Cir. 2004), the Eleventh Circuit explained that "the operative word in the statute is 'may,'" and that the plaintiff need only demonstrate "that the waste disposed of 'may present' an imminent and substantial threat." The court pointed out that "endangerment" means "a threatened or potential harm, and does not require proof of actual harm." <u>Id.</u> According to the court, the term "imminent" means "threatens to occur immediately," thus, requiring that the plaintiff show "that there is a potential for an imminent threat of a serious harm to the environment or health." <u>Id.</u> (citations omitted).

According to the Second Circuit, an "'imminent hazard' may be declared at any point in a chain of events which may ultimately result in harm to the public." <u>Cordiano v. Metacon Gun Club, Inc.</u>, 575 F.3d 199, 210 (2nd Cir. 2009). The court went on to explain that "endangerment" requires the plaintiff to show "'a reasonable prospect of future harm . . . so long as the threat is near-term and involves potentially serious harm.'" 575 F.3d at 211. In <u>Crandall v. City and County of Denver, Co.</u>, 594 F.3d 1231, 1237 (10th Cir. 2010), the Tenth Circuit held the view that under RCRA, the actual harm need not be likely to occur for a long time, "so long as the defendant's current or past actions create a present risk that the harm will eventually come to pass." On the other hand, the court explained, although the harm contemplated by the statute "may be well in the future, the *endangerment* must be imminent." <u>Id.</u>, at 1238 (Emphasis in original).

The Governmental Defendants argue that Plaintiffs' RCRA claim cannot withstand summary judgment because the Plaintiffs have not identified a pathway for people to be exposed to contamination from the Landfill, and therefore, there is no imminent and substantial risk to health. Defendants cite the expert report of David E. Langseth, in which he opines: "Dickson

County has effectively removed the potential for imminent and substantial endangerment to human health related to using groundwater in the Designated Potential Risk Area (DPRA) through the remedial response actions it has already implemented under Tennessee Department of Environment and Conservation (TDEC) direction and oversight." (Docket No. 370-41, at 9 of 33). Defendants cite the Declaration of Shaun A. Winter, a consultant for the City and County of Dickson, in which he states that he performed an investigation of the soil and groundwater at the Holt Plaintiffs' properties in July, 2010, and found no detectable levels of chlorinated volatile organic compounds. (Exhibit 369, at ¶¶ 2-5).

Defendants contend that both the State of Tennessee and the EPA have determined that no imminent and substantial endangerment exists. Defendants cite the testimony of TDEC employee Chuck Head, taken in July, 2010, who states: "At this point, we do not believe there's an imminent and substantial threat posed by the landfill . . . or the contaminants in the landfill." (Docket No. 446-17, at 2 of 3). Defendants also cite a letter from the EPA to Plaintiff Sheila Holt-Orsted dated January 11, 2010 in which EPA employee A. Stanley Meiburg states: "Based upon currently available information, EPA believes that there are no ongoing unacceptable human health impacts associated with exposure to contaminants released from the DCL." (Docket No. 399-2, at 3 of 3).

Defendants also contend that Plaintiffs cannot establish an imminent and substantial endangerment to the environment. Defendants argue that the Plaintiffs' only evidence of an environmental threat is based on the expert report of Julian Lewis, in which he opines that a rare subterranean obligate aquatic fauna could be impacted. Defendants argue that Dr. Lewis's opinion is speculative, and cite the opinion of their expert, Dr. Wendell Pennington, who opines

that "chlorianted solvents in the vicinity of the landfill do not present an imminent and substantial endangerment to the environment, particularly to the surface or subterranean aquatic fauna." (Docket No. 370-53, at 7 of 64).

On the other hand, the Plaintiffs contend that their proof indicates that the Landfill contamination may present an imminent and substantial threat to health or the environment. Plaintiffs cite the report of one of their experts, Stavros S. Papadopulos, who opines, among other things, that "TCE and/or PCE, and/or their biodegradation products have been detected in soils beneath the Landfill, and at concentrations above drinking water standards in the groundwater below the Landfill, in Sullivan and Bruce Springs, in several residential wells around the Landfill, in a municipal well, DK-21, and in surface water samples from the Worley Furnace Branch and the West Piney River." (Docket No. 382-1, at 9 of 65). Dr. Papadopulos also opines that the "remedial measures implemented by Dickson County do not eliminate the risks associated with groundwater contaminated by the Landfill. . . " (Id., at 10 of 65). As mentioned above, Plaintiffs also argue that the environment is threatened by the contamination, and cite the expert report of Julian Lewis, in which he opines that a rare subterranean obligate aquatic fauna could be impacted by the Landfill contamination. (Docket No. 383-1, at 5 of 28).

Plaintiffs argue that actions taken by the State of Tennessee to ameliorate the Landfill contamination have been ineffectual, and TDEC's position that no imminent or substantial endangerment exists is belied by other evidence. Plaintiffs also dispute the Defendants' view that the EPA has sanctioned the safety of the Landfill. Plaintiffs cite a brief filed by the EPA in another court to support its motion to quash a subpoena issued by the Plaintiffs. In resisting the subpoena, the EPA states in its brief: "Most critically, the EPA has not made a finding of

whether or not contamination at DCL [Dickson County Landfill] constitutes an imminent and substantial endangerment to health or the environment." (Docket No. 414-18, at 8 of 16). As for the letter sent to Plaintiff Holt-Orsted, the brief states:

> EPA's letters do not opine as to the health effects of contamination. On the contrary, EPA's letters state that, in the context of information available to EPA regarding such completed actions as an extended public water line and regulatory restrictions on drinking water wells, there is no *current,* on-going exposure to contaminated groundwater. EPA's statements say nothing regarding the health effects of contamination from [the Landfill], only that steps have been taken to ensure that there is no present, and presumably no future, exposure to contaminants.

(Id., at 7 of 16). Elsewhere in the brief, the EPA states that "all recent facts" concerning the Landfill cleanup in EPA's files have been provided by TDEC and its contractors, and that the agency lacks "recent or current involvement in the [Landfill] remediation." (Id., at 5 of 16).

Given the numerous genuine issues of disputed material facts presented in the documents submitted by the parties, the Court concludes that the summary judgment requested by both the Governmental Defendants and the Plaintiffs as to whether the Landfill "may present an imminent and substantial endangerment to health or the environment" is not warranted.

C. Actions of EPA and State Bar this Citizen Suit

The Governmental Defendants argue that the actions of the EPA and the State of Tennessee regarding the Landfill should bar the Plaintiffs' lawsuit. The Plaintiffs argue, on the other hand, that no RCRA provision bars this suit.

Subsection (b)(2) of the "citizen suits" provision of RCRA, 42 U.S.C. § 6972, describes the circumstances under which a citizen is prohibited from bringing an action involving an imminent and substantial endangerment to health or the environment. Such a suit is prohibited where the EPA Administrator has taken certain actions, specifically delineated in Section

6972(b)(2)(B)(i) through (iv).[1]  Such a suit is also prohibited where the State has taken certain

actions, specifically delineated in Section 6972(b)(2)(C)(i) through (iii).[2] In a previous decision,

---

[1]  Section 6972 (b)(2)(B) provides:

(B) No action may be commenced under subsection (a)(1)(B) of this section if the Administrator, in order to restrain or abate acts or conditions which may have contributed or are contributing to the activities which may present the alleged endangerment--

> (i) has commenced and is diligently prosecuting an action under section 6973 of this title or under section 106 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 [42 U.S.C.A. § 9606], [FN1]

> (ii) is actually engaging in a removal action under section 104 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 [42 U.S.C.A. § 9604];

> (iii) has incurred costs to initiate a Remedial Investigation and Feasibility Study under section 104 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 [42 U.S.C.A. § 9604] and is diligently proceeding with a remedial action under that Act [42 U.S.C.A. § 9601 et seq.]; or

> (iv) has obtained a court order (including a consent decree) or issued an administrative order under section 106 of the Comprehensive Environmental Response, Compensation and Liability Act of 980 [FN2] [42 U.S.C.A. § 9606] or section 6973 of this title pursuant to which a responsible party is diligently conducting a removal action, Remedial Investigation and Feasibility Study (RIFS), or proceeding with a remedial action.

In the case of an administrative order referred to in clause (iv), actions under subsection (a)(1)(B) of this section are prohibited only as to the scope and duration of the administrative order referred to in clause (iv).

[2]  Section 6972 (b)(2)(C) provides:

(C) No action may be commenced under subsection (a)(1)(B) of this section if the State, in order to restrain or abate acts or conditions which may have contributed

this Court denied the Corporate Defendants' motion to dismiss based on the argument that this action is barred under 42 U.S.C. § 6972(b)(2)(B)(iv) because the Commissioner of the State of Tennessee Department of Environment and Conservation issued an order regarding the Landfill in 2001. (Docket Nos. 253, 254).

In the pending motion, the Defendants do not cite a particular provision as a bar to this action, but rather cite the "spirit and intent of the preclusionary language in the citizen suit provision." (Defendants' Memorandum Of Law In Support Of County Of Dickson And City Of Dickson's Motion For Summary Judgment, at 25 (Docket No. 379)). The cases cited by the Governmental Defendants, however, rely on the particular statutory provisions cited above to bar such suits. Under these circumstances, the Court declines to create a bar to this suit that is not based on the language of the statute or applicable case law.

D. Primary Jurisdiction and Burford Absention

The Governmental Defendants also argue that the Court should dismiss Plaintiffs' claims based on the primary jurisdiction doctrine or the Burford abstention doctrine. Defendants

---

or are contributing to the activities which may present the alleged endangerment--

(i) has commenced and is diligently prosecuting an action under subsection (a)(1)(B) of this section;

(ii) is actually engaging in a removal action under section 104 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 [42 U.S.C.A. § 9604]; or

(iii) has incurred costs to initiate a Remedial Investigation and Feasibility Study under section 104 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 [42 U.S.C.A. § 9604] and is diligently proceeding with a remedial action under that Act [42 U.S.C.A. § 9601 et seq.].

contend that dismissal is warranted to avoid disruption of the ongoing efforts by the State of Tennessee to address the Landfill contamination at issue here.

In a previous decision, this Court denied the Corporate Defendants' motion to dismiss based on these same grounds. (Docket Nos. 253, 254). The Defendants have not made any new arguments in their summary judgment motion warranting the Court's reconsideration of its prior ruling. Accordingly, the Court denies summary judgment based on the primary jurisdiction and Burford abstention doctrines for the reasons stated previously by the Court.

E. Contribution Liability of Defendants

    1. RCRA Contribution Liability

Under RCRA, a plaintiff may bring an action against any person "who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). To prevail on a claim under this section, Plaintiffs must show: (1) "that the defendant is a person, including, but not limited to, one who was or is a generator or transporter of solid or hazardous waste or one who was or is an owner or operator of a solid or hazardous waste treatment, storage, or disposal facility; (2) that the defendant has contributed to or is contributing to the handling, storage, treatment, transportation, or disposal of solid or hazardous waste; and (3) that the solid or hazardous waste may present an imminent and substantial endangerment to health or to the environment." Cox v. City of Dallas, Texas, 256 F.3d 281, 292 (5th Cir. 2001)(footnote omitted). See also United States v. Aceto Agricultural Chemicals Corp., 872 F.2d 1373, 1382 n.9 (8th Cir. 1989).

The Fifth Circuit has defined the word "contribute," for purposes of RCRA, to mean "have a part or share in producing an effect." Cox, 256 F.3d at 295. See also Aceto, 872 F.2d at 1384. Based on legislative history, courts have held that the term is to be construed broadly. See, e.g., Aceto, 872 F.2d at 1383.

Through their motion for summary judgment, the Corporate Defendants contend that they have not "contributed to" the handling, storage, treatment, transportation, or disposal of solid or hazardous waste. Plaintiffs, on the other hand, argue in their summary judgment motion that Defendants City of Dickson, County of Dickson, and Nemak have contributed to the disposal of waste that "may present an imminent and substantial endangerment to health or the environment."

### 2. Defendant ALP Lighting

The Corporate Defendants argue that ALP Lighting is entitled to summary judgment because the proof indicates that it did not contribute to the contamination at issue. The Defendants argue that there were only three waste streams at the Dickson facility that may have contained TCE and/or PCE, and they were not disposed of at the Landfill:

> Waste stream #15 was a one-time shipment in 1998 of excess virgin TCE. The virgin TCE was shipped to a recycler. Waste stream #16 is the liquid residue collected from the punctured aerosol cans. This waste stream is hauled by a licensed hazardous waste hauler under manifest to disposal sites other than the Dickson County Landfill. . . Finally, aerosol cans were part of the solid hazardous waste stream, as testified to by Mr. Scott Walker during his deposition on July 22, 2010, and were hauled by a licensed hazardous waste hauler under manifest to disposal sites other than the Dickson County Landfill. . .

(Id., at ¶ 3 (Docket No. 410-4, at 9-10 of 25)).

Defendants also cite the testimony of Scott Walker, who was hired in 1992 as the quality engineer, and later as environmental engineer, at Lexalite International Corporation, the

company that owned the Dickson facility prior to the time ALP Lighting acquired the facility in 2007. (Deposition of Scott Walker, at 10-13 (Docket No. 361-3, at 107 of 107; Docket No. 361-4, at 1-3 of 107)). Mr. Walker testified that the policy of the facility was that all aerosol cans, which contained TCE and PCE, were to be disposed of in hazmat drums that were carried by waste haulers to a site other than the Landfill. (Id., at 31-36 (Docket No. 361-4, at 10-15 of 107)). Mr. Walker was not aware of aerosol cans ever being disposed of in the general waste of the facility. (Id., at 144-45 (Docket No. 361-4, 19-20 of 107)). Mr. Walker left the facility in 2002. (Id., at 12 (Docket No. 361-4, at 2 of 107)).

In addition, Defendants point to the testimony of expert, Dr. Henry Y. He, to support the contention that ALP's waste could not have caused the contamination at issue. (Docket No. 361-8, at 61-79 of 107).[3]

On the other hand, the Plaintiffs cite the testimony of James Ennis, who has been employed by ALP Lighting, or its predecessor Laxalite, since 1990. (Deposition of James Ennis, at 9-10 (Docket No. 361-4, at 26-27 of 107)). Mr. Ennis became the environmental engineer at the Dickson facility in 2002. (Id., at 41 (Docket No. 361-4, at 31of 107)). Mr. Ennis explained that approximately 48 different products containing TCE, primarily in aerosol cans, were used at the Dickson facility. (Id., at 156 (Docket No. 410-22, at 38 of 73)). According to Mr. Ennis, from 1985 to 1998, employees would place empty aerosol cans in a dumpster with the other trash. (Id., at 83-85 (Docket No. 410-22, at 30-32 of 73)). Although "empty," those cans would still have residual liquids remaining when they were disposed in the general trash. (Id., at 83-85

---

[3] The Court has taken an inordinate amount of time in attempting to locate the evidence cited by the Corporate Defendants to support their statements of fact. The parties are advised that future filings should refer to clearly identified depositions, affidavits or exhibits, rather than to a "compilation" number.

(Docket No. 410-22, at 30-32 of 73)). Mr. Ennis also testified that products containing TCE might be found on rags used at the facility, and those rags, if totally dry, could be placed in a dumpster with the other trash. (Id., at 38, 56, 61-64, 135 (Docket No. 410-22, at 10, 18-22, 36 of 73)). Plaintiffs cite records from ALP Lighting's waste hauler, as well as records from the Landfill, indicating that trash from the company's Dickson facility went to the Landfill from 1988-1995. (See Docket Nos. 410-5, 410-10).

One of Plaintiffs' experts, Kirk Wye Brown, states that the residual "PCE and/or TCE containing liquids, once released from their containers, were subject to volatilization in the landfill gas which allowed transport of these chemical compounds throughout the waste layer in the landfill." (Declaration of Kirk Wye Brown, Exhibit A, at 17 (Docket No. 388-1, at 19 of 76)). Mr. Brown ultimately opined: "The movement of PCE, and/or TCE, and their biological degradation products, along with other hazardous substances from the ALP wastes contributed to the concentrations of these hazardous substances that were found in the surface water and groundwater at the Dickson County Landfill and areas adjacent to the Landfill at concentrations above the Federal Drinking Water Standards." (Id. (citations omitted)).

Based on this record, the Court concludes that genuine issues of material fact exist, including the ones identified above, as to the contribution liability of Defendant ALP Lighting, precluding the entry of summary judgment.

3. Defendant Interstate Packaging

The Corporate Defendants argue that Interstate Packaging is entitled to summary judgment because the proof indicates that it did not contribute to the contamination at issue. Defendants point to documents and testimony indicating that Interstate sent hazardous waste

offsite to a hazardous waste disposal facility, and not to the Landfill. (Docket No. 361-6, at 57 of 107; Affidavit of Sam Russell ((Docket No. 361-6, at 102-106 of 107); Affidavit of Larry Robertson (Docket No. 361-6, at 97-101 of 107); Deposition of Jim Lunn (Docket No. 361-7, at 40-50 of 107)). Defendants also point to the expert testimony of Linda Phipps to support their contention that Interstate's waste could not have caused the contamination at issue. (Docket No. 361-7, at 25-31 of 107).

On the other hand, Plaintiffs cite the testimony of Edna Goodwin, a former employee of Interstate, who states that she used a mixture containing TCE and PCE in the company's operations for some period of time beginning in the late 1970s. (Deposition of Enda Goodwin, at 32-33, 35 (Docket No. 410-25, at 16-18 of 24)). Plaintiffs cite the testimony of Paul Lynes, a consultant who had been hired by Interstate, and Interstate Co-President Michael Doochin, who indicate that this mixture was processed in a still that produced "still bottoms," and that some of those still bottoms were disposed of at the Landfill. (Deposition of Paul Lynes, at 90, 98-99, 156 (Docket No. 414-8, at 41, 49-50, 75 of 103); Deposition of Michael Doochin, at 124-25,126, 130 (Docket No. 414-10, at 13-16 of 38)). Plaintiffs cite the testimony of Odell Sanders, a former Interstate employee, who states that he picked up buckets of liquid from the area where Ms. Goodwin worked and placed them in an area where he assumes they were bound for the Landfill. (Deposition of Odell Sanders, at 58-60 (Docket No. 414-13, at 11-13 of 37); Affidavit of Odell Sanders, at ¶¶ 2-4 (Docket No. 414-13, at 36-37 of 37)). Plaintiffs also cite the testimony of Farris Brown and Gary Warf who hauled trash from Interstate to the Landfill. (Deposition of Farris Brown (Docket No. 410-24); Deposition of Gary Warf (Docket No. 410-19)).

In addition, Plaintiffs' expert Kirk Wye Brown opines that: "The movement of PCE, TCE, and other hazardous substances from the Interstate Packaging wastes contributed to the concentrations of these hazardous substances that were found in the surface water and groundwater at the Dickson County Landfill and areas adjacent to the Landfill at concentrations above the Federal Drinking Water Standards." (Brown Declaration, at 20 (Docket No. 388-1, at 22 of 76) (citations omitted)).

Based on this record, the Court concludes that genuine issues of material fact exist, including the ones identified above, as to the contribution liability of Defendant Interstate Packaging, precluding the entry of summary judgment.

4. Defendant Nemak

The Corporate Defendants argue that Nemak is entitled to summary judgment because the proof indicates that it did not contribute to the contamination at issue. Defendant Nemak, which operated a facility at the Dickson Industrial Park beginning in 1987, contends that the PCE-containing wastes that it may have disposed in certain portions of the Landfill did not contribute to the contamination there. Defendants cite the testimony of their expert, Dr. Henry Y. He, to support their contention that Nemak's waste could not have caused the contamination at issue. (Docket No. 361-8, at 61-79 of 107). Defendants also cite the deposition of one of Plaintiffs' experts, Dr. Stavros Papadopulos, in which he states that he agrees that Nemak's PCE disposal could not be responsible for DNAPL (denser-than-water-nonaqueous-phase-liquid) TCE beneath the Landfill. (Deposition of Dr. Stavros Papadopulos, at 403 (Docket No. 414-11, at 14 of 34); Report of Dr. Stavros Papadopulos, at 3 (Docket No. 382-1, at 9 of 65)).

On the other hand, the Plaintiffs cite the opinion of expert, Kirk Wye Brown, who states: "The movement of PCE and other hazardous substances from the Nemak wastes contributed to the concentrations of these hazardous substances that were found in the surface water and groundwater at the Dickson County Landfill and areas adjacent to the Landfill at concentrations above the Federal Drinking Water Standards." (Brown Declaration, at 14-15 (Docket No. 388-1, at 16-17 of 76) (citations omitted)).

Based on this record, the Court concludes that genuine issues of material fact exist, including the ones identified above, as to the contribution liability of Defendant Nemak, precluding the entry of summary judgment for either Defendant Nemak or the Plaintiffs.

5. The Governmental Defendants

Plaintiffs' request for summary judgment as to the liability of the Governmental Defendants is denied for the same reasons set forth above for denying the Governmental Defendants' request for summary judgment – the numerous genuine issues of disputed material facts as to whether the Landfill "may present an imminent and substantial endangerment to health or the environment."

F. Standing

The Defendants argue that Plaintiff NRDC does not have standing to bring this action.[4] The plaintiff bears the burden of establishing standing requirements. Lujan v. Nat'l Wildlife Fed., 497 U.S. 871, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1990). For a plaintiff organization to establish Article III standing, it must show the following: (1) its members would otherwise have standing to sue in their own right; (2) the interests at stake are germane to the

_____

[4] In a previous decision, this Court denied the Corporate Defendants' motion to dismiss based on these same grounds. (Docket Nos. 253, 254).

organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. <u>Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.</u>, 528 U.S. 167, 120 S.Ct. 693, 704, 145 L.Ed.2d 610 (2000).  For an individual plaintiff to establish Article III standing, the plaintiff must show: (1) he or she "suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." <u>Id.</u>

Defendants argue that Plaintiff NRDC has identified only one member, Joyce Tucker, as having standing, and contend that she is not actually a member of NRDC, and alternatively, that Ms. Tucker has not suffered an "injury in fact."

Defendants argue that Ms. Tucker is not a member of NRDC because she stated in her deposition that she gave the organization a donation of $10 in 2004, and NRDC membership rules require a donation every 15 months.  Thus, according to the Defendants, she was not a member of NRDC when the action was filed in 2008, and is not currently a member.

The only factual support cited by Defendants is the following statement in Ms. Tucker's deposition:

> Q.  When did you first become aware of the organization the Natural Resources Defense Council?
> A.  I think around 2004.
> Q.  How did you become aware of the NRDC?
> A.  I received a letter in the mail.
> Q.  What did that – what was that letter?
> A.  It outlined the functions or purposes and solicited my membership.

(Deposition of Joyce Tucker, at 12-13 (Docket No. 414-16, at 13 of 66)).

Although not cited by the Defendants, Ms. Tucker goes on to state that, in response to the letter she received from NRDC, she sent a donation of $10. (Id., at 13). She was then asked if she became a member of NRDC at that point, and she said: "Over time I – yes, I continued." (Id.) Ms. Tucker was then asked when she became an official member of NRDC, and she said that she did not know. (Id.) Ms. Tucker later explained that she believed making a donation to NRDC automatically made her a member, and stated that she had been receiving mailings from NRDC since 2004. (Id., at 14-15). Defendants have not cited any statements by Ms. Tucker indicating that the donation she made in $10 was the only donation she made to NRDC, nor any other statement indicating that her membership in NRDC ceased before this lawsuit was filed or that she is not currently a member of NRDC.

On the other hand, the Plaintiffs have cited a Supplemental Declaration of Linda Lopez, NRDC's director of membership and public education, in which Ms. Lopez indicates that Ms. Tucker has donated at least $10 to NRDC at least once every 15 months since 2003. (Supplemental Declaration of Linda Lopez, at ¶ 4 (Docket No. 413)). Ms. Lopez states that Ms. Tucker has been a member of NRDC since 2003, and attaches as an exhibit Ms. Tucker's donation history for NRDC. (Id., at ¶ 5). Defendants have offered no evidence to the contrary. Under these circumstances, the Court concludes that Defendants' argument regarding Ms. Tucker's membership in NRDC is meritless.

Defendants also argue that Ms. Tucker, who lives five miles from the Landfill, has not suffered an injury in fact. First, Defendants contend that Ms. Tucker's well water has not tested positive for PCE or TCE, and that Plaintiffs' expert, Harlee Strauss, has testified there is currently no risk posed by Ms. Tucker's well water, and she was unable to opine about any

potential risk to her well in the future.  Second, Defendants argue that Ms. Tucker does not suffer any aesthetic injury based on contamination to the West Piney River because she has never swam in, fished in, or otherwise used the West Piney River.

As explained in a prior opinion, a plaintiff need not show that she is currently using contaminated water in order to establish standing. The Supreme Court has warned against raising "the standing hurdle higher than the necessary showing for success on the merits." Laidlaw, 120 S.Ct. at 704.  A RCRA citizen suit may be brought where the contamination "*may* present an imminent and substantial endangerment to the health or the environment." 42 U.S.C. § 6972(a)(1)(B).  See Interfaith Community Organization v. Honeywell International, Inc., 399 F.3d 248, 257 (3rd Cir. 2005).

In Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc., the Supreme Court held that plaintiffs in an environmental lawsuit had established injury in fact because their fear of using a nearby polluted waterway was reasonable and subjected them to economic and aesthetic harms. 120 S.Ct. at 184-85.  According to the Court, "environmental plaintiffs adequately allege injury in fact when they allege that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." 120 S.Ct. at 705.  The Court cited the Friends of the Earth members' statements that they would use the North Tyger River for recreation if the defendant were not discharging pollutants into it as sufficient to show injury in fact. Id., at 704-05.  One of those members who was found to have standing alleged that "he would like to fish, camp, swim, and picnic in and near the river between 3 and 15 miles downstream from the facility, as he did when he was a teenager, but would not do so because he was concerned that the water was polluted by Laidlaw's discharges."

Id., at 704. Another member "lived 20 miles from Roebuck, and would use the North Tyger River south of Roebuck and the land surrounding it for recreational purposes were she not concerned that the water contained harmful pollutants." Id., at 705.

The Court made clear that "the affiants' conditional statements – that they would use the nearby North Tyger River for recreation if Laidlaw were not discharging pollutants into it" – should not be "equated with the speculative 'some day' intentions to visit endangered species halfway around the world that we held insufficient to show injury in fact in [Lujan v. National Wildlife Federation, 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)]." Id., at 705-06. See also Interfaith, 399 F.3d at 254-58 (Court finds plaintiffs who lived near former site of chromium manufacturing plant and were concerned about health risks caused by exposure to pollutants from site adequately alleged standing in RCRA citizen suit).

Plaintiffs have filed an affidavit of Ms. Tucker in which she describes her fear that PCE or TCE will contaminate her private water well, as well as the public water supply in Dickson County, to which she is exposed at local restaurants and at other private homes. (Declaration of Joyce Tucker, at ¶¶ 3-12 (Docket No. 371-3)). Ms. Tucker also states that she lives approximately one mile from the West Piney River, and that she and other residents have been told that high levels of TCE have been found in the West Piney River. (Id., at ¶¶ 3, 7, 11). Ms. Tucker indicates that she would like to take her grandchildren wading in the West Piney River because it is close to her house, but has taken them to streams farther away instead due to her concern that they may be exposed to TCE in the River. (Id., at ¶ 14). Ms. Tucker also indicates that she walks by the West Piney River occasionally, but that the TCE contamination has led her to walk there less often, and has generally reduced her enjoyment of the river. (Id., at ¶ 15).

Applying the case law cited above to Ms. Tucker's statements, the Court concludes that

Ms. Tucker has adequately alleged injury in fact to her recreational and aesthetic enjoyment of

the West Piney River to establish standing in this case.[5]

G. Jurisdiction/Standing

Plaintiffs argue that jurisdiction has been established in this case because (1) they have

given the statutorily-required notice of their intent to sue; (2) this action is not precluded under

any of the exceptions found in the statute; and (3) the individual Plaintiffs and NRDC have

standing. In response to Plaintiffs' argument that jurisdiction is established in this case, the

Defendants argue only that Plaintiff NRDC has not established standing on the grounds set forth

above.  As the Court has rejected those grounds, and the Defendants make no other challenge to

jurisdiction or standing in this case, the Court concludes that Plaintiffs' request for partial

summary judgment on the issue of jurisdiction is granted.

---

[5]  The Court is aware of the recent Sixth Circuit decision in Heartwood, Inc. v. Agpaoa, 2010 WL 5060606 (Sixth Cir. Dec. 13, 2010) in which the court held that the plaintiff non-profit corporation lacked standing to challenge the United States Forest Service's land use plans for the Daniel Boone National Forest, specifically the agency's plans for commercial logging and the use of herbicides in the Forest.  In reaching its decision, the court explained that the plaintiff's members did not adequately allege specific injury to their aesthetic, recreational, or scientific interests regarding a designated portion of the 25,000 acre forest resulting from implementation of the land use plans.

In this case, by contrast, Ms. Tucker states that hazardous waste contamination found at the Landfill, located approximately five miles from her house, is believed to have spread, or is spreading, to the West Piney River, which is located approximately one mile from her house, and a source of the public water supply in Dickson County. (Docket No. 371-3).  Unlike the injuries alleged by the plaintiff members in Heartwood, the injury alleged by Ms. Tucker as a result of the contamination is specific, concrete and is fairly traceable to the challenged action of the Defendants.

## IV.  Conclusion

For the reasons set forth herein, the parties' motions for summary judgment are denied with the exception of the Plaintiffs' request for summary judgment on the issue of jurisdiction.

It is so ORDERED.

TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE